

**FILED**

Jan 27 2017, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven Ripstra
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Roger Wilkinson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 27, 2017

Court of Appeals Case No.
74A05-1603-CR-741

Appeal from the Spencer Circuit
Court.
The Honorable Jon A. Dartt, Judge.
Cause No. 74C01-1504-F4-60

**Barteau, Senior Judge**

# Statement of the Case

[1] Roger Wilkinson appeals his convictions of possession of methamphetamine, a Level 5 felony,[1] unlawful possession of a syringe, a Level 6 felony,[2] operating a vehicle while intoxicated, a Class A misdemeanor,[3] operating a vehicle with a Schedule I or II controlled substance or its metabolite in the body, a Class C misdemeanor,[4] and possession of marijuana, a Class B misdemeanor.[5] We affirm.

# Issue

[2] Wilkinson raises the following restated issues for our review:

> I. Whether there was sufficient evidence to support his convictions related to operating a vehicle;
>
> II. Whether the warrantless search of his vehicle violated the Indiana and Federal constitutions; and
>
> III. Whether the trial court abused its discretion when it denied his motion to correct error alleging juror misconduct.

---

[1] Ind. Code § 35-48-4-6.1 (2014).

[2] Ind. Code § 16-42-19-18 (2015).

[3] Ind. Code § 9-30-5-2(b) (2001).

[4] Ind. Code § 9-30-5-1(c) (2001).

[5] Ind. Code § 35-48-4-11(a)(1) (2014).

## Facts and Procedural History

[3] On April 10, 2015, at approximately 10:00 a.m., Christine Unversaw returned home and found a strange, gray BMW parked in her driveway. She saw an individual, later identified as Wilkinson, slumped over in the front seat. Christine went into her house to ask her husband, Shane, if he was expecting a visitor. Shane indicated he was not, and went outside to investigate. Christine followed, and the two approached the vehicle and observed Wilkinson holding his hand over his eyes and rocking back and forth. Wilkinson appeared disoriented and unsteady. He had trouble keeping his head up, and slurred his words. The vehicle's windshield was damaged, and there was extensive damage to the driver's side. The Unversaws asked Wilkinson if he needed help. He replied that he was "okay." Tr. p. 296. Shane called 911 because both he and Christine thought Wilkinson needed assistance.

[4] Officer James Faulkenburg with the Santa Claus Police Department arrived on the scene first, followed by Sergeant Harold Gogel and Deputy Marvin Heilman with the Spencer County Sheriff's Department. (The officer, sergeant and deputy will be collectively referred to as "the officers.") The officers determined Wilkinson was the individual seated behind the wheel, and that the vehicle was registered to Brett Cieslack. Cieslack had loaned the car to his daughter for her personal use.[6]

---

[6] It is unclear from the record why Wilkinson had the vehicle in his possession.

Wilkinson appeared to be sleeping and was slumped over behind the steering wheel. The officers noticed the damage to the vehicle, but determined that it was drivable. Emergency medical personnel also responded to the scene, but left shortly after arriving because the officers determined they were not needed.

Gogel and Faulkenburg approached the driver's side of the vehicle. Heilman approached from the passenger side. Faulkenburg asked Wilkinson "if he was okay" and if he needed any medical attention. *Id*. at 398. Wilkinson stated that he did not know. Faulkenburg noticed that Wilkinson's speech was slurred, but he showed no signs of physical injury. Faulkenburg opened the driver's side door and observed a plastic vial laying between Wilkinson's legs. Faulkenburg placed the vial on top of the vehicle.

Heilman, who was on the other side of the vehicle, saw a partially filled bottle of rum on the floorboard. He opened the passenger-side door and entered the vehicle. Once inside, he saw a hand-rolled cigarette he believed to be a marijuana cigarette. Neither he nor Gogel smelled alcohol on Wilkinson, but Heilman thought Wilkinson looked "lethargic," and "seemed to be impaired," and might be under the influence of illegal drugs. *Id*. at 440. Gogel noticed a package of cigarette rolling papers on the vehicle's floorboard.

Faulkenburg asked Wilkinson to exit the vehicle, but had to lend assistance because Wilkinson was unable to do so on his own. Wilkinson was patted down. A cloth bag was found in the front pocket of his hooded sweatshirt. A

syringe and a small glass jar were found inside of the bag. Wilkinson was placed in handcuffs and seated on the ground.

[9] Heilman eventually took possession of the plastic vial that was found between Wilkinson's legs. Without opening the vial, he determined it contained a hand-rolled cigarette and plastic bags that contained powdery substances. The vial was opened and it was confirmed that it contained three plastic bags that contained a white, powdery substance. The substances from two of the bags were tested using a field test kit. They tested positive for methamphetamine.

[10] Gogel asked Wilkinson if he would take a field sobriety test at the scene, or a certified test at the law enforcement center. Wilkinson declined. At some point he was arrested and taken to jail, and the vehicle was impounded.

[11] After arriving at the jail, a warrant was obtained to take a sample of Wilkinson's blood. His blood tested positive for amphetamine, methamphetamine, and THC – an active component of marijuana. The rolled cigarettes and the substances found in the plastic bags were analyzed by the Indiana State Police Laboratory. One of the cigarettes was found to contain marijuana. It was confirmed that the other substances contained methamphetamine. Wilkinson was charged with eight offenses related to possession of drugs and paraphernalia, and operation of a vehicle while intoxicated.

[12] Pre-trial, Wilkinson filed a motion to suppress the items found in the vehicle. A hearing was held on the matter, following which the trial court denied the

motion.  The items (the rum bottle, the hand-rolled cigarettes, the plastic container and its contents, the cloth bag and its contents) were admitted into evidence at trial over Wilkinson's objection.  A jury found Wilkinson guilty of five of the eight offenses, and he was sentenced to an aggregate term of six years.[7]

[13]   Post-trial, Wilkinson filed a motion to correct error, alleging juror misconduct. It was determined that two jurors, Guy Whelan and Henry Warsinsky, both knew State's witness Brett Cieslack, but failed to disclose this during voir dire or the trial.  Wilkinson asked the court to order a new trial.  Following a hearing on the matter, the trial court denied the motion.  Wilkinson now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[14]   Wilkinson was convicted of Class A misdemeanor operating a vehicle while intoxicated, and operating a vehicle with a Schedule I or II controlled substance or its metabolite in the body.  He maintains the State failed to present sufficient evidence that he actually operated the vehicle while intoxicated because

---

[7] In addition to the offenses for which he eventually was found guilty, Wilkinson also was charged with Class A misdemeanor possession of paraphernalia, Level 6 felony possession of paraphernalia, and Class A misdemeanor possession of marijuana, apparently because a glass pipe was found at the scene of the incident. However, because no officer could testify, specifically, to where the pipe was found, the trial court excluded it from evidence.  The State moved to dismiss the charges and the motions were granted.

security camera footage that allegedly showed him operating the vehicle was destroyed and not placed into evidence.[8]

[15] Facts relevant to this issue are as follows. The Unversaws had security cameras. Their cameras captured footage of a gray BMW exiting the road that ran in front or their house and entering their driveway. Unsuccessful attempts were made to transfer the footage to a DVD. However, Deputy Faulkenburg was able to make a recording of the footage using his cell phone. The original footage was taped-over. The deputy's recording was not made available for trial.

[16] When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the judgment, without reweighing the evidence or reassessing witness credibility. *Morgan v. State*, 22 N.E.3d 570, 573 (Ind. 2014). We affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

[17] To convict Wilkinson of operating a vehicle while intoxicated, as a Class A misdemeanor, the State was required to prove beyond a reasonable doubt that

---

[8] Wilkinson also seems to imply that the State's failure to preserve the camera footage caused the jury to consider Shane Unversaw's testimony regarding his recollection of the footage as useful to the State's case, rather than as potentially exculpatory. However, because Wilkinson does not develop his argument, we decline to address it.

he "operate[d] a vehicle while intoxicated . . . in a manner that endanger[ed] a person." Ind. Code § 9-30-5-2 (2001). To convict him of operating a vehicle with a controlled substance in his body, as a Class C misdemeanor, the State was required to prove he operated a vehicle with a controlled substance listed in Schedule I or II of Indiana Code section 35-48-2 or its metabolite in his body. Ind. Code § 9-30-5-1(c) (2001). Indiana Code section 9-13-2-86 (2013) defines intoxication in pertinent part as under the influence of a Schedule I or II substance "so that there is an impaired condition of thought and action and the loss of normal control of a person's faculties." *See also* Ind. Code § 35-48-1-9 (1988). Impairment can be established by evidence of the following: "(1) the consumption of a significant amount of alcohol; (2) impaired attention and reflexes; (3) watery or bloodshot eyes; (4) the odor of alcohol on the breath; (5) unsteady balance; and (6) slurred speech." *Outlaw v. State*, 918 N.E.2d 379, 381 (Ind. Ct. App. 2009), *opinion adopted*, 929 N.E.2d 196 (Ind. 2010). We find that sufficient evidence was presented to establish that Wilkinson operated the gray BMW while intoxicated.

[18] Wilkinson, who was seated behind the wheel of the BMW, told Shane Unversaw that he had been in an accident. Shane called 911 and told the dispatcher that a gray BMW was in his driveway, and that the individual in the vehicle might need medical attention because he was "out of it," "disoriented." State's Exhibit 1 – Recording of 911 Call. The 911 call was entered into evidence and played for the jury. Shane testified that he reviewed the security camera footage which showed the gray BMW exit the road and enter his

driveway at approximately 9:30 a.m. Deputy Faulkenburg testified that he viewed the camera footage and that it showed the BMW enter the Unversaws' driveway from the main road. Christine Unversaw testified that when she left her house at 6:00 a.m., the BMW was not in her driveway. Upon her return at approximately 10:00 a.m., the vehicle was parked in her driveway. The officers arrived at approximately 10:30 a.m. The Unversaws and the officers testified that they observed Wilkinson slumped behind the wheel of the vehicle, and that he appeared unsteady and lethargic. Shane testified that the security camera footage did not show Wilkinson exiting the vehicle before the officers arrived.

[19] Wilkinson's blood was tested following his arrest. The toxicology report admitted into evidence showed that his blood tested positive for amphetamine and methamphetamine (Schedule II substances), and THC (a Schedule I substance). An expert in toxicology testified that, in her opinion, Wilkinson was impaired due to the level of controlled substances found in his body.

[20] From this evidence, the jury could have reasonably concluded that Wilkinson operated the gray BMW while intoxicated. Wilkinson's arguments to the contrary amount to nothing more than a request to reweigh the evidence, which we will not do. *See Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied*. We conclude the jury was presented with sufficient evidence of probative value to establish that Wilkinson operated the vehicle while intoxicated, and to support his convictions for Class A misdemeanor operating a vehicle while intoxicated, and Class C misdemeanor operating a vehicle with a Schedule I or II controlled substance or its metabolite in the body.

# II. Warrantless Search

[21] Wilkinson claims the warrantless search that led to the discovery of drugs in his vehicle was improper under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. He maintains there was no probable cause or reason for the search, and that upon arriving at the scene, the officers assumed, prior to finding any evidence of criminal activity, that "[he] must [have been] involved with drugs." Appellant's Br. p. 28.

[22] Wilkinson appeals from the trial court's admission of the evidence following a completed trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *See Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003). A trial court is afforded broad discretion in ruling on the admissibility of evidence, and we will reverse such a ruling only upon a showing of an abuse of discretion. *Id*. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id*. We will not reweigh the evidence, and we consider conflicting evidence in the light most favorable to the trial court's ruling. *Collins v. State,* 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied.*

[23] The State argues that the search was permitted under the following exceptions to the warrant requirement: the automobile exception, the plain view doctrine, and search incident to arrest. As an appellate court, we will sustain the trial

court if it can be done on any legal ground apparent in the record. *Ratliff v. State,* 770 N.E.2d 807, 809 (Ind. 2002). We find here that the search of the vehicle and Wilkinson's person was justified under the medical assistance and automobile exceptions, the plain view doctrine, and a search incident to a lawful arrest.

### A. United States Constitution

The Fourth Amendment states that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrantless search or seizure is per se unreasonable, and the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *Osborne v. State*, 63 N.E.3d 329, 331 (Ind. 2016) (citations and quotation omitted).

### Exceptions to Warrant Requirement

One such exception relevant to the circumstances in this case is that the law enforcement officer had "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." *Michigan v. Fisher,* 558 U.S. 45, 49, 130 S. Ct. 546, 549, 175 L. Ed. 2d 410 (2009) (internal quotations omitted); *see also Mincey v. Arizona,* 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978) ("Numerous state and federal cases have

recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.") (footnotes omitted). Our courts have recognized this exception. *See Osbourne*, 63 N.E.3d at 332.

[26] Under the plain view doctrine, a police officer is permitted to seize items when he inadvertently discovers items of readily apparent criminality while rightfully occupying a particular location. First, the initial intrusion must have been authorized under the Fourth Amendment. Second, the items must be in plain view. Finally, the incriminating nature of the evidence must be immediately apparent. *Jones v. State,* 783 N.E.2d 1132, 1137 (Ind. 2003).

> The immediately apparent prong of the doctrine requires that the officer have probable cause to believe the evidence will prove useful in solving a crime. This does not mean that the officer must know that the item is evidence of criminal behavior. Probable cause requires only that the information available to the officer would lead a person of reasonable caution to believe the items could be useful as evidence of a crime. A practical, nontechnical probability that incriminating evidence is involved is all that is required. A lawful seizure must be based upon a nexus between the item seized and particular criminal behavior. The nexus must be one known to the officers at the time of the seizure and may not be based upon mere speculation.

*State v. Figgures,* 839 N.E.2d 772, 779 (Ind. Ct. App. 2005) (citations and quotation marks omitted), *trans. denied.*

The automobile exception is another well-recognized exception to the Fourth Amendment's warrant requirement. *See Myers v. State,* 839 N.E.2d 1146 (Ind. 2005). A search falls within this exception when a vehicle is readily mobile and probable cause exists to believe it contains contraband or evidence of a crime. *Maryland v. Dyson,* 527 U.S. 465, 467, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999). Where there is probable cause to search a vehicle, a search is not unreasonable if it is based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained. *Id.* "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." *Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (1996) (citing *California v. Carney,* 471 U.S. 386, 393, 105 S. Ct. 2066, 2070, 85 L. Ed. 2d 406 (1985)). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *U.S. v. Ross*, 456 U.S. 798, 825, 102 S. Ct. 2157, 2173, 72 L. Ed. 2d 572 (1982).

Another exception to the warrant requirement is a search incident to a lawful arrest. *Wilson v. State*, 754 N.E.2d 950, 956 (Ind. Ct. App. 2001). A suspect is considered under arrest when a police officer interrupts his freedom and restricts his liberty of movement. *Fentress v. State*, 863 N.E.2d 420, 423 (Ind. Ct. App. 2007). The fact that a police officer does not inform a defendant he is under arrest prior to a search does not invalidate the search incident to arrest exception as long as there is probable cause to make an arrest. *Id.* Probable

cause for an arrest exists if at the time of the arrest the officer has knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the suspect has committed the criminal act in question. *Id.* A police officer's subjective belief concerning whether he had probable cause to arrest a defendant has no legal effect. *Id.* An arrest is lawful if it is supported by probable cause. *Id.* A search incident to lawful arrest allows the arresting officer to conduct a warrantless search of the arrestee's person and the area within his immediate control. *Wilson,* 754 N.E.2d at 956. "A search incident to a valid arrest is lawful regardless of what it reveals." *Garcia v. State*, 47 N.E.3d 1196, 1200 (Ind. 2016) (quoting *Farrie v. State,* 255 Ind. 681, 683, 266 N.E.2d 212, 214 (1971)).

### 1. Medical Assistance Exception

[29] Here, the warrantless entry of Wilkinson's vehicle was permissible under the medical assistance exception to the Fourth Amendment because it was reasonable for the officers to believe Wilkinson needed medical attention. The Unversaws placed a 911 call because a strange car that had been wrecked was parked in their driveway, and the driver of the vehicle was disoriented and unsteady. The officers responded to the call and confirmed the Unversaws' observations. Wilkinson was slumped over behind the wheel, his speech was slurred, and he responded, "I don't know" when asked if he needed help. Tr. p. 398. Under these circumstances, the officers had an objectively reasonable basis to believe that Wilkinson might need medical assistance. The State has

carried its burden of showing an exception to the warrant requirement to justify entry into the vehicle.

## 2. Plain View Doctrine

[30] Regarding the plain view doctrine, the first part of the doctrine (intrusion authorized by the Fourth Amendment) is satisfied, as the officers were responding to the Unversaws' 911 call regarding a strange, wrecked vehicle sitting in their driveway. We find the second part of the doctrine is satisfied because the seized items were in plain view. The last part of the doctrine also is satisfied. It was reasonable for the officers to believe the items found could be useful as evidence of a crime based upon the 911 call, the officers' initial observations of the vehicle and of Wilkinson, and Wilkinson's demeanor.

[31] The vehicle Wilkinson was driving was damaged. Deputy Heilman testified that Wilkinson appeared lethargic and seemed impaired. Wilkinson did not seem to suffer from any physical injuries. His speech was slurred. Heilman looked into the vehicle and saw a partially filled bottle of rum, and a hand-rolled cigarette he believed to be a marijuana cigarette. Officer Faulkenburg saw a plastic vial laying on the front seat between Wilkinson's legs, and a package of rolling papers on the floorboard. Both Heilman and Faulkenburg testified that Wilkinson required assistance to exit the vehicle.

[32] While additional testimony revealed that the officers did not smell alcohol on Wilkinson or in the car, and that Heilman smelled the cigarette but did not detect an odor of marijuana, as noted above, probable cause under the

immediately apparent clause of the plain view doctrine requires only that the information available to the officer would lead a person of reasonable caution to believe the items found could be useful as evidence of a crime. We conclude that the items found in Wilkinson's vehicle passed this test.

### 3. Automobile Exception

[33] As for the automobile exception, we find under these circumstances that the exception applies. Probable cause existed for a reasonably prudent person to believe that a search of the vehicle where Wilkinson was found would uncover evidence of a crime. The officers, responding to a 911 call, found Wilkinson at 10:30 in the morning in a wrecked but still operational vehicle that was parked in a strange driveway. He was slumped behind the wheel, and appeared lethargic, unsteady, and impaired. The officers observed in plain view a partially filled bottle of rum, a hand-rolled cigarette, cigarette rolling papers, and a small plastic vial. These items gave the officers probable cause to believe that evidence of the crimes for which Wilkinson ultimately was charged (operating a vehicle while intoxicated and under the influence of controlled substances) would be found. Once probable cause was established, the officers were permitted to search any items in the vehicle that might conceal controlled substances, including the plastic vial that contained methamphetamine and a marijuana cigarette. *See Ross*, 456 U.S. at 825.

## 4. Search Incident to Lawful Arrest

[34] We find that the officers had probable cause to arrest Wilkinson, and a lawful basis to search his person. Wilkinson was found behind the wheel of a wrecked vehicle and in an impaired state. In plain view were a rum bottle, a hand-rolled cigarette, cigarette rolling papers, and a small plastic vial. Based upon Wilkinson's demeanor and the items found in the vehicle, the officers had probable cause to arrest him for operating a vehicle while intoxicated. Wilkinson was assisted out of the vehicle, patted down, and handcuffed. A cloth bag was found in the front pocket of his sweatshirt. The bag was opened and the syringe was found inside.

[35] The cloth bag was found on Wilkinson's person, and at the time it was opened, the officers had established probable cause to arrest him. This was a valid search incident to a lawful arrest. *See, e.g., U.S. v. Robinson*, 414 U.S. 218, 236, 94 S. Ct. 467, 477, 38 L. Ed. 2d 427 (1973) ("Having in the course of a lawful search come upon the crumpled package of cigarettes, [the officer] was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as fruits, instrumentalities, or contraband probative of criminal conduct.") (internal quotation and string citation omitted).

[36] In light of these exceptions to the warrant requirement, the officers' search and seizure did not violate the Fourth Amendment. The items were properly seized, and the trial court did not abuse its discretion in admitting the items into evidence at trial.

## B. Indiana Constitution

[37] Wilkinson also argues that the warrantless search violated Article I, Section 11 of the Indiana Constitution. Although the text of this provision is identical to the Fourth Amendment, the two have been afforded somewhat different interpretations. *See Shotts v. State,* 925 N.E.2d 719, 726 (Ind. 2010). More specifically, conformity of a search to the Indiana Constitution turns on an evaluation of the "reasonableness" of the conduct of the law enforcement officers under the circumstances, rather than on the expectation of privacy that is commonly associated with analysis under the Fourth Amendment. *Litchfield v. State,* 824 N.E.2d 356, 359 (Ind. 2005).

[38] We determine the reasonableness of a search or seizure by balancing: (a) the degree of concern, suspicion, or knowledge that a violation has occurred; (b) the degree of intrusion the method of the search or seizure imposes on the citizens' ordinary activities; and (c) the extent of law enforcement needs. *Rush v. State,* 881 N.E.2d 46, 52 (Ind. Ct. App. 2008). We give Article 1, Section 11 liberal construction in favor of protecting individuals from unreasonable intrusions on privacy, *id.*, and the State must bear the burden of showing that, under the totality of the circumstances, an intrusion was reasonable. *Mitchell v. State,* 745 N.E.2d 775, 786 (Ind. 2001).

[39] As for the first factor, the officers had a high degree of suspicion that a violation had occurred. Wilkinson was found in a stranger's driveway, slumped behind the wheel of a wrecked vehicle. He appeared impaired, and there was a

partially-filled bottle of rum, a hand-rolled cigarette, cigarette rolling papers, and a suspicious looking plastic vial in plain view in the vehicle.

[40] Regarding the second factor, the officers' degree of intrusion was low. After receiving information from the 911 dispatcher that an individual appeared to need medical attention, and shortly after discovering Wilkinson, the officers entered his vehicle to determine whether assistance was needed. The search of the vehicle was limited to those items that were in plain view. The items found in plain view, along with Wilkinson's demeanor, provided probable cause for the arrest. Once probable cause was established for the arrest, the officers were authorized to conduct a thorough search of Wilkinson. *See Edmond v. State*, 951 N.E.2d 585, 592 (Ind. Ct. App. 2011) ("Although the search of a person's body is a substantial intrusion, a police officer is authorized to conduct a thorough search of an arrestee.") The search of Wilkinson's person was only a pat-down search of his clothing.

[41] Under the third factor, the need of law enforcement was high because the officers needed to enter the vehicle to determine whether Wilkinson required medical attention.

[42] Considering all three factors, we conclude that under the totality of the circumstances the search of the vehicle and Wilkinson's person was reasonable. Thus, the trial court properly denied Wilkinson's motion to suppress regarding his claims under Article I, Section 11 of the Indiana Constitution, and was within its discretion to admit the items found into evidence.

# III. Juror Misconduct

[43] Wilkinson next argues the trial court abused its discretion when it denied his motion to correct error that alleged juror misconduct, and declined to grant a new trial. Jurors Guy Whelan and Henry Warsinsky both failed to disclose during voir dire or trial that they knew State's witness Brett Cieslack (the owner of the vehicle in which Wilkinson was found). Wilkinson specifically argues that this lack of disclosure caused him harm and deprived him of a fair trial because 1) Cieslack's testimony implicated him as the driver of the vehicle, and 2) the jurors' connection to Cieslack and Cieslack's daughter (to whom the vehicle was on loan) might have made them less likely to consider whether the contraband found in the vehicle belonged to "someone connected to Cieslack." Appellant's Br. p. 32.

[44] During voir dire, the trial court read to all prospective jurors the names of the witnesses that would testify at trial, including Brett Cieslack's, and asked the jurors if they were related to any of the witnesses by blood or marriage. Neither Guy Whelan nor Henry Warsinsky disclosed any knowledge of Cieslack. When Whelan entered the juror box, the prosecutor asked him and fellow jurors if they had any connection to the parties, "or anything that you've thought of maybe that you hadn't thought of initially. . . [.]" Tr. p. 159. Whelan did not respond. When Warsinsky entered the juror box, the prosecutor asked him and other jurors if they had "thought of any other particular reasons that you would not be able to serve on this particular jury – either because you know something about it or have remembered you had some

knowledge or connection to one of the parties or anything like that . . . ? Anything at all like that?" *Id*. at 212. Warsinsky did not respond. Defense counsel asked Warsinsky and other jurors if they had any "personal or prior relationships with any of the witnesses that have been named[.]" *Id*. at 217. Again, Warsinsky did not respond. When the chosen jurors, including Whelan and Warsinsky, returned for the start of the trial, the trial court again asked, "Has anyone of you realized that you know something about the case that you did not disclose previously? If so[,] raise your hand." *Id*. at 235. No hands were raised.

[45] In certain circumstances, the failure of a juror to disclose a relationship to one of the parties may entitle the prejudiced party to a new trial. *Stephenson v. State*, 864 N.E.2d 1022, 1055 (Ind. 2007) (citation omitted). "Generally, proof that a juror was biased against the defendant or lied on *voir dire* entitles the defendant to a new trial." *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind. 1988). However, to obtain a new trial based on a claim of juror misconduct, the defendant must demonstrate that the misconduct was gross and likely harmed the defendant. *Stephenson*, 864 N.E.2d at 1055. Furthermore, the defendant must present "specific, substantial evidence" establishing that a juror was possibly biased. *Id*. (quoting *Lopez,* 527 N.E.2d at 1130).

[46] When ruling on a motion to correct error, the trial court sits as the initial factfinder concerning the issues raised, and we review its decision for an abuse of discretion. *Booher v. State,* 773 N.E.2d 814, 817 (Ind. 2002). We review the trial judge's determination on whether a defendant should be entitled to a new

trial because of juror misconduct for abuse of discretion. *Griffin v. State,* 754 N.E.2d 899, 901 (Ind. 2001). We find that the trial court did not abuse its discretion in denying Wilkinson's motion to correct error and determining he was not entitled to a new trial.

[47] At the hearing on Wilkinson's motion, Brett Cieslack testified that he knew both Warsinsky and Whelan, that Warsinsky was a friend of his son, and that Guy Whelan owned a bar and grill restaurant that was located next door to Cieslack's business. He testified that Warsinsky had been to his house "with a bunch of [other friends of his son]" and that he saw the group pass through his house "and that's about it." Tr. p. 974. Cieslack indicated that he was not close friends with either juror.

[48] Henry Warsinsky testified that he did not hear during voir dire that Cieslack was one of the individuals on the witness list. He recognized Cieslack when he entered the witness stand but did not bring this to the court's attention. He testified he is good friends with Cieslack's son, that he is a Facebook friend of the son, but does not communicate with the son through Facebook. Warsinsky further testified that sometime after the trial, he and Cieslack talked in general about Warsinsky being on the jury, but "[did not] discuss the case at all[,] really." *Id.* at 997. He also testified that knowing Cieslack did not influence his decision in Wilkinson's case.

[49] At the same hearing, Whelan testified that when he was asked during voir dire if he knew Cieslack, he did not at that time recognize the name because he

misheard Cieslack's first name to be "Brent", not Brett. He further testified that he knew Cieslack as an "acquaintance," but had no other contact with him other than "occasionally going to his church" and seeing him at the restaurant. *Id*. at 986. Whelan and Cieslack are friends on Facebook but do not communicate with each other through Facebook. When asked if knowing Cieslack kept him from being impartial in reaching his decision in Wilkinson's case, Whelan answered that it did not.

[50] Whelan and Warsinsky should have informed the court of their connections to Cieslack. However, Cieslack's connection to the two jurors was casual. No evidence was presented that the jurors deliberately withheld their acquaintance with Cieslack. Although Wilkinson asserts that the two jurors' connections to Cieslack might have made them less likely to consider whether the items found in the BMW might have belonged to someone related to Cieslack, Wilkinson points to no evidence that supports his assertion. Also, ample evidence was presented, beyond Cieslack's testimony, that Wilkinson was the driver of the vehicle.

[51] Moreover, Wilkinson presents no specific, substantial evidence that the two jurors were biased. ". . . [M]erely being friends on Facebook does not, *per se*, establish a close relationship from which bias or partiality on the part of a juror may reasonably be presumed." *See Slaybaugh v. State*, 44 N.E.3d 111, 118 (Ind. Ct. App. 2015) (quoting *McGaha v. Commonwealth*, 414 S.W.3d 1, 6 (Ky. 2013)), *aff'd*, 47 N.E.3d 607 (Ind. 2016). He also has failed to show that the jurors' lack of disclosure was gross and harmed him.

Wilkinson has failed to meet his burden of showing juror misconduct. *See, e.g., Stephenson,* 864 N.E.2d at 1055 (holding that a juror's failure to disclose that he knew the victim's sister, who was a witness at trial and was the Sunday school teacher of the juror's children, did not entitle the defendant to a new trial because the defendant had failed to present "specific evidence" that the juror was biased or that the juror's "nondisclosure of this casual connection" had any effect on the juror's performance). The trial court was well within its discretion to deny his motion to correct error.

## Conclusion

For the reasons stated above, we affirm the trial court.

Affirmed.

Mathias, J., and Altice, J., concur.